IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

PHILLIP PARKER,                          )
    Plaintiff,                          )
                                  )
                                  )
    v.                                  )      Civil No. 3:14cv618 (HEH)
                                  )
CAROLYN W. COLVIN,                       )
Acting Commissioner of Social Security,  )
    Defendant.                          )
_____)

## REPORT AND RECOMMENDATION

Phillip W. Parker ("Plaintiff") is forty-eight years old and previously worked as the

general manager of a fitness club. On April 6, 2011, Plaintiff applied for Social Security

Disability Insurance Benefits ("DIB") under the Social Security Act ("Act"), alleging disability

due to Post-Traumatic Stress Disorder ("PTSD"), an associated Bipolar I Disorder, personality

disorder and anxiety, with an alleged onset date of June 25, 2010. Plaintiff's claims were denied

both initially and upon reconsideration. On July 31, 2013, Plaintiff (represented by counsel)

appeared before an Administrative Law Judge ("ALJ") for an administrative hearing. The ALJ

subsequently denied Plaintiff's claims in a written decision dated August 23, 2013. On October

25, 2013, Plaintiff requested review of the ALJ's decision. On July 9, 2014, the Appeals Council

denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the

Commissioner of Social Security ("Commissioner").

Plaintiff now appeals the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the

ALJ erred in assessing Plaintiff's credibility, in assessing Dr. Benesek's opinion and in assessing

the Department of Veterans Affairs ("VA") disability rating. (Pl.'s Mem. in Supp. of Mot. for

Summ. J. ("Pl.'s Mem.") (ECF No.9) at 8.)  The parties have submitted cross-motions for summary judgment, which are now ripe for review.

Having reviewed the parties' submissions and the entire record in this case, the Court is now prepared to issue a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below, the Court recommends that Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED, that Plaintiff's Motion for Summary Judgment (ECF No. 8) be GRANTED and that the final decision of the Commissioner be VACATED and REMANDED.

## I.   BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical history, function report and testimony are summarized below.

### A.  Education and Work History

Plaintiff was forty-four years old when he applied for DIB.  (R. at 199-201.)  Plaintiff graduated from high school.  (R. at 204.)  Plaintiff served in the United States Army from December 1985 to December 1989.  (R. at 342, 453.)  Plaintiff worked most recently in June 2010 as the general manager of a fitness club.  (R. at 43.)  Before becoming the general manager, Plaintiff worked as the membership director for the same fitness club.  (R. at 45.)

### B.  Medical Records

#### 1.   Group Therapy Programs

Plaintiff had been involved with the PTSD program at McGuire VA Medical Center ("VAMC") since December 15, 2010.  (R. at 453.)  In July 2010, John Lynch, Ph.D. diagnosed Plaintiff with PTSD, with symptoms including nightmares, flashbacks, intrusive thoughts, hyperarousal, avoidance and some brief psychotic symptoms.  (R. at 345, 368.)  Plaintiff also

reported experiencing irritability, difficulty concentrating, anger, hypervigilance and exaggerated startle response. (R. at 345.) Dr. Lynch noted that Plaintiff was socially isolated and withdrawn in his PTSD symptomology. (R. at 345.) This resulted in Plaintiff's limited social interaction with others. (R. at 345.) Plaintiff's September 1, 2010 screening test for depression was negative. (R. at 357-58.)

In December 2010, Plaintiff requested enrollment in the VA's PTSD Recovery Program. (R. at 345.) The VA provided Plaintiff with a structured treatment program involving a series of programs that required group therapy and individual follow-ups. (R. at 453.) From June 21, 2011, to August 9, 2011, Plaintiff participated in a PTSD Recovery Group. (R. at 290-302.) Plaintiff attended a total of eight sessions. (R. at 290-302.)

On June 28, 2011, Elbert F. Sholar, M.D., a Staff Psychiatrist, reported that Plaintiff appeared casually dressed and cooperative, and that he maintained good eye contact. (R. at 298-99.) Additionally, Dr. Sholar stated that Plaintiff had a linear, logical, goal-oriented thought process, as well as non-pressured, relevant and fluent speech. (R. at 299.) Additionally, Plaintiff had no suicidal or homicidal ideation and no delusions or obsessions. (R. at 299.) Plaintiff maintained appropriate and full range affect, and fair insight and judgment. (R. at 299.) Plaintiff exhibited an anxious mood. (R. at 299.) Effective June 24, 2011, the VA determined that Plaintiff was unable to work full-time due to his psychiatric illnesses. (R. at 252-54.)

On July 13, 2011, Dr. Sholar conducted another mental health status examination. (R. at 292-96.) Plaintiff reported that he had difficulty sleeping and that he slept too long on a higher dose of trazodone. (R. at 293.) Plaintiff also reported going to a PTSD treatment group, which he found to be "very helpful." (R. at 293.) Plaintiff appeared casually dressed and cooperative, and he maintained good eye contact. (R. at 293-94.) Additionally, Plaintiff had a linear, logical,

3

goal-oriented thought process, as well as non-pressured, relevant and fluent speech. (R. at 293.) Additionally, Plaintiff had no suicidal or homicidal ideation and no delusions or obsessions. (R. at 293-94.) Plaintiff had appropriate and full range affect, and his insight, judgment and mood were fair. (R. at 293-94.) Other mental health status examinations conducted through April 19, 2013, revealed similar findings. (R. at 303, 328, 347, 423, 457, 472, 476, 479.) On December 14, 2011, Plaintiff's screening test for depression returned a positive result. (R. at 439.)

From January 5, 2012, to March 22, 2012, Plaintiff participated in a PTSD Cognitive Processing Therapy Group. (R. at 418-432.) On February 23, 2012, Plaintiff saw Meghan Richetti, Psy. D. for an individual fifty-minute mental health psychotherapy session as part of the PTSD Cognitive Processing Therapy Group. (R. at 423.) Dr. Richetti indicated that Plaintiff appeared on time for his appointment and that he was casually dressed and appropriately groomed. (R. at 423.) Additionally, the report stated that Plaintiff maintained good eye contact and that he exhibited no abnormalities of speech, thought or perception. (R. at 423.) Plaintiff denied any suicidal ideation. (R. at 423.) On March 9, 2012, Plaintiff reported that he found the PTSD Cognitive Processing Therapy Group beneficial. (R. at 420-21.)

On March 8, 2012, the VA issued a rating decision increasing Plaintiff's psychiatric disorder rating (including Bipolar I Disorder, PTSD and major depression) from fifty percent to seventy percent disabling, effective June 24, 2011. (R. at 252.) The decision was based upon six items of evidence dated between June and November 2011, and Plaintiff's Global Assessment of Functioning ("GAF") score[1] was fifty-one, indicating moderate symptoms or moderate difficulty in social, occupational or school functioning. (R. at 252-53.)

---

[1]      The GAF is a numerical scale (0 through 100) sometimes used by mental health clinicians and physicians to rate the social, occupational and psychological functioning of adults. Notably, the latest version of the Diagnostic and Statistical Manual of Mental Health Disorders

From January 16, 2013, to March 20, 2013, Plaintiff participated in a PTSD Stress Management Group. (R. at 461-67, 471.) Progress reports indicated that Plaintiff was attentive and engaged throughout each of the ten sessions. (R. at 461-67, 471.) While the progress report from the January 30, 2013 session (Session 3) indicated that Plaintiff failed to contribute actively, Plaintiff arrived on time and was otherwise attentive and engaging. (R. at 466.) Progress reports from the other nine PTSD Stress Management Group sessions indicated that Plaintiff actively participated in group discussions. (R. at 461-67, 471.)

From April 9, 2013, to June 11, 2013, Plaintiff participated in a PTSD Life Skills Group that focused on sleep hygiene. (R. at 455-461, 498-511.) On April 19, 2013, Plaintiff reported that he found the PTSD program to be helpful and that he took advantage of the information provided. (R. at 456.) In the same report, Dr. Benesek wrote that Plaintiff continued to struggle with anxiety, some paranoia, social withdrawal and PTSD symptomology. (R. at 456.) Dr. Benesek reported that Plaintiff's run-ins with his former wife and his son's deployment to Afghanistan exacerbated his symptoms. (R. at 456.) Dr. Benesek assessed Plaintiff's PTSD and major depressive disorder and assigned a GAF score of fifty-five. (R. at 456-57.)

On June 11, 2013, Plaintiff attentively and actively engaged in the group therapy discussion. (R. at 498). During the session, Plaintiff offered support and constructive feedback to another group member who was dealing with a child custody case. (R. at 498.) During an earlier session, Plaintiff reported that he attended his son's wedding despite feeling uncomfortable with the crowd. (R. at 509.) Plaintiff reported that he was able to engage in conversation with his brother-in-law, despite having some issues with him. (R. at 509.)

---

("DSM") has dropped the use of GAF scores finding that their use has been criticized due to a "conceptual lack of clarity," and "questionable psychometrics in routine practice." DSM-5 16 (American Psychiatric Association 2013.)

2. Individual Therapy

Plaintiff also received periodic individual therapy from Dr. Benesek. (R. at 453.) In a February, 7, 2012 letter, Dr. Benesek opined that Plaintiff's symptoms satisfied the diagnostic criteria of PTSD. (R. at 453-454.) Dr. Benesek noted that Plaintiff participated in group and individual therapy and that Plaintiff was prescribed Trazodone and Alprazolam as needed for anxiety and panic attacks. (R. at 454.) Dr. Benesek wrote that Plaintiff came to his attention on January 4, 2011, although Plaintiff had been involved with the PTSD program at VAMC since December 15, 2010. (R. at 453.)

Dr. Benesek's letter confirmed that Plaintiff had actively participated in group therapy and individual follow-up appointments since his initial enrollment date. (R. at 453.) Plaintiff had received treatment through the VAMC's mental health clinic since at least 1994. (R. at 453.) Dr. Benesek wrote that Plaintiff was currently rated at fifty percent service-connected Bipolar I Disorder, as well as ten percent for back strain and ten percent for a knee condition. (R. at 453.) Plaintiff's total combined disability rating was sixty percent. (R. at 453.) More specifically, Dr. Benesek wrote that Plaintiff's level of PTSD was severe enough that it significantly interfered with his occupational, interpersonal and social functioning. (R. at 454.) According to Dr. Benesek, "disregarding all other medical conditions . . . [Plaintiff] has been and is still unable to obtain or maintain gainful employment solely due to this PTSD, a condition that is almost certainly the direct result of his combat and war zone experiences." (R. at 454.)

After the ALJ denied Plaintiff's claim and Plaintiff requested review of that decision, Dr. Benesek provided a second written summary of Plaintiff's conditions. (R. at 512-15.) In a letter dated November 20, 2013, Dr. Benesek described his clinical basis for Plaintiff's diagnosis and described why Plaintiff was unable to consistently sustain any work activity. (R. at 512-15.) Dr.

Benesek believed that Plaintiff continued to meet PTSD criteria. (R. at 512.) Additionally, Dr. Benesek wrote that while some of Plaintiff's symptoms were self-reported, many were clinically manifested and confirmed by direct observations during therapy sessions. (R. at 512.) Regarding Plaintiff's ability to work, Dr. Benesek reiterated his opinion that Plaintiff could not consistently meet the demands of the "world of work." (R. at 513.) Dr. Benesek acknowledged that the ALJ afforded his opinions little weight, because they were "inconsistent with the claimant's stated activities," but disagreed that they implied that Plaintiff had the ability to work. (R. at 514.)

C. Function Report

On May 31, 2011, Plaintiff completed a function report. (R. at 228-235.) Plaintiff lived with his family in a house. (R. at 228.) Plaintiff's morning routine included waking up, watching the morning news, eating breakfast, taking his medication and checking his schedule for the upcoming day. (R. at 228.) Plaintiff then ate lunch and took his medication. (R. at 228.) His afternoon routine included reading or having reading time with his two-year-old son. (R. at 228.) Following dinner with his family, Plaintiff watched the news, spent time with his family, took his medication and went to bed. (R. at 228.)

Plaintiff reported that his wife helped with the care of other people or animals living in the household. (R. at 229.) His condition affected his sleep and resulted in night terrors and flash backs. (R. at 229.) Plaintiff had no problems with personal care, but needed special reminders to take care of his personal needs, grooming and medication. (R. at 230.) Before the onset of his condition, Plaintiff was completely self-sufficient, and he could lift, run, work, walk and stand for prolonged periods of time. (R. at 229-230)

7

Plaintiff reported that he could not perform yard work due to pulmonary problems. (R. at 231.) Plaintiff reported having difficulty concentrating. (R. at 231.) Plaintiff went outside daily, traveled by car and could drive and ride as a passenger. (R. at 231.) Although Plaintiff could count change, he could not pay bills, manage a savings account or use a checkbook or money orders. (R. at 231.) Because Plaintiff had difficulty handling money, Plaintiff's wife was responsible for all financial matters. (R. at 231-32.)

Plaintiff listed that his only hobby or interest was watching television, but reported that he was "very active prior to [his] health and mental conditions." (R. at 232.) Plaintiff spent time with others, mainly with family members. (R. at 232.) Plaintiff reported that his wife reminded him to go to his appointments and that he required someone to accompany him. (R. at 232.) Since his symptoms returned, Plaintiff felt withdrawn, depressed and disinterest in interacting with others. (R. at 233.)

Plaintiff's condition affected his ability to lift, walk, climb stairs, squat, sit, bend, kneel, stand, complete tasks, concentrate and socialize. (R. at 233.) Plaintiff could walk thirty to fifty yards before he needed to rest. (R. at 233.) After resting for one minute, Plaintiff could resume walking. (R. at 233.) Plaintiff reported that he could pay attention for three to five minutes and that he did not finish activities that he started. (R. at 233.) Plaintiff reported that he occasionally followed spoken instructions well, but his adherence to directions depended on the individual's "delivery." (R. at 233.) Plaintiff had problems getting along with authority figures and had been fired or laid off from a job because of problems getting along with others. (R. at 234.)

D. Plaintiff's Testimony

On July 31, 2013, Plaintiff (represented by counsel) testified during a hearing before the ALJ. (R. at 39.) Plaintiff stated that he was forty-six years old and lived with his wife and his

8

two youngest children. (R. at 39, 41-42.)  Plaintiff had five children total. (R. at 41.)  Plaintiff

graduated high school, attended one year of college and served in the United States Army from

December 1985 to December 1989. (R. at 42.)  Plaintiff had not worked since June 25, 2010,

and received $3,100 a month from the VA. (R. at 43.)

Most recently, Plaintiff worked as the general manager of a fitness club. (R. at 43.)

Plaintiff testified that his responsibilities involved supervising approximately fifty employees

and managing the payroll. (R. at 43-44.)  Although Plaintiff did not interact directly with clients,

he hired, reviewed and fired employees. (R. at 43.)  Plaintiff previously worked as the fitness

club's membership director. (R. at 45.)  Plaintiff testified that each period of employment lasted

two years. (R. at 44.)  Plaintiff also worked as an iron and dock worker and as a driver for a

freight company within the past fifteen years. (R. at 45.)

Plaintiff testified that he was unable to work because of inconsistent bouts of depression,

difficulty dealing with the public, sleep disturbance and uncontrollable lower back pain. (R. at

46-47.)  Plaintiff testified that he suffered from asthma, a right knee injury and uncontrolled

blood pressure. (R. at 47.)  On a scale of zero-to-ten, ten being the worst pain imaginable,

Plaintiff rated his lower back pain before taking any medication as a six. (R. at 49.)  Plaintiff

was prescribed Tramadol and Cyclobenzaprine for his pain. (R. at 48.)  Plaintiff testified that

medication decreased his lower back pain level from a six to a three. (R. at 49.)  The same

medication helped alleviate his right knee pain. (R. at 49.)

Plaintiff testified that his asthma and "almost daily" asthma attacks forced him to use an

Albuterol inhaler. (R. at 51.)  However, the severity of his asthma fluctuated with the seasons,

with extremely hot or cold days requiring more frequent use of the inhaler. (R. at 51.)  Speaking

of his medications collectively, Plaintiff testified that they forced him to take a nap three to four times each week (R. at 52.)

Plaintiff testified that he drove twice a week, cut his one-acre lot with a tractor once a week, washed the dishes approximately twice a month and went to the grocery store and visited with friends monthly. (R. at 53-59.) Plaintiff enjoyed reading the newspaper, occasionally watched television and used a computer. (R. at 53-61.) Plaintiff frequently visited his mother, who lived 300 yards away from Plaintiff's home. (R. at 61.) Plaintiff also testified that he watched his sons at martial arts classes and exercised by lifting weights two to three times a week. (R. at 40-41, 57.) Plaintiff exercised at home and attempted to go to the public gym once or twice a week. (R. at 40-41.) However, of the eight to ten gym visits that Plaintiff planned each month, he would arrive at the gym, but leave without entering on two or three of those occasions. (R. at 66-68.) Plaintiff testified that this behavior was related to his mental health, because he sometimes felt that he would not be able to cope with other people. (R. at 66-68.) The heaviest weight that he could consistently lift was 185 pounds. (R. at 48.)

Plaintiff testified that he took his children to King's Dominion, an amusement park, upon the recommendation of those involved with the PTSD program at the VAMC. (R. at 58.) Plaintiff testified that the program encouraged him to enter into in various social settings. (R. at 58.) However, Plaintiff remained isolated and distrusting of others following his participation in multiple treatment programs at the VAMC. (R. at 60.) Plaintiff testified that his wife, children and mother were the only people that he felt comfortable around. (R. at 61.)

Plaintiff testified that the inconsistent nature of his PTSD and depression mainly prevented him from working. (R. at 63-64.) Plaintiff testified that people often saw him functioning at 100 percent on good days or for short periods of time, but that people other than

10

his wife and mother never see the "worst case scenario." (R. at 79.) Plaintiff believed that he would be able to work if it were not for his PTSD symptoms and depression. (R. at 64.)

Plaintiff testified that his PTSD resulted in daily panic attacks since his honorable discharge from the United States Army. (R. at 61-62, 72-73.) "Crowds, a lot of people talking [and] a lot of noise" triggered Plaintiff's panic attacks. (R. at 74.) Additionally, Plaintiff testified that hearing people speaking Spanish occasionally triggered a panic attack, because he was stationed in Central and South America. (R. at 74-75.) While employed by the fitness club, Plaintiff would often seclude himself in his office or leave the premises until the panic attacks subsided. (R. at 72-73.) Plaintiff believed that his panic attacks were "much worse" than in previous years. (R. at 73.)

Plaintiff testified that he moved to the country to get away from people and to be closer to his mother. (R. at 70-71.) Plaintiff coped with his PTSD and depression by staying close to home and by minimizing interaction with others. (R. at 70.) He also sought treatment and therapy for his PTSD in recent years. (R. at 73.) With the help of the VA, Plaintiff enrolled in multiple PTSD programs that encouraged him to confront the triggers of his PTSD "up front." (R. at 73.) Plaintiff testified that some of the treatment programs involved "writing out combat situations" and "going out in public." (R. at 73.) Plaintiff attributed the increase in the severity of his panic attacks to the treatment and therapy programs. (R. at 73-75.) Plaintiff also testified that he believed that his PTSD and depression were exacerbated when his son was deployed to Afghanistan. (R. at 71-72.)

Plaintiff testified that he assisted his children's t-ball team for approximately one month when asked by another parent to help. (R. at 77-78.) However, Plaintiff stopped helping the team, because his sons were no longer interested in playing t-ball. (R. at 78.) Plaintiff testified

that he would have liked to continue assisting the team and possibly coaching if he could have consistently done so. (R. at 78.)

## II.   PROCEDURAL HISTORY

On April 6, 2011, Plaintiff filed his application for DIB, claiming disability due to PTSD with an alleged onset date of June 25, 2010. (R. at 199, 203.) Plaintiff also alleged disability due to an associated Bipolar I Disorder, personality disorder and anxiety. (R. at 203.) The claim was initially denied on September 1, 2011, and upon reconsideration on February 17, 2012. (R. at 114-18, 123-29.) On July 31, 2013, an ALJ held a hearing. (R. at 34-90.) On August 23, 2013, the ALJ issued a written decision, denying Plaintiff's claim and concluding that Plaintiff was not disabled under the Act, because Plaintiff could perform other work that existed in the national economy. (R. at 17-33.) On July 9, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. at 1-6.) Plaintiff timely commenced this civil action seeking judicial review.

## III.   QUESTIONS PRESENTED

1.  Did the ALJ err in assessing Plaintiff's credibility?

2.  Did the ALJ err in assessing Dr. Benesek's opinion?

3.  Does Dr. Benesek's November 20, 2013 letter constitute new evidence warranting remand?

4.  Did the ALJ err in assessing the VA disability determination?

## IV.   STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to determining whether substantial evidence in the record supports the Commissioner's decision and whether the proper legal standards were applied in evaluating the evidence. *Hancock v.*

*Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)).  Substantial evidence is more than a scintilla, is less than a preponderance, and is the

kind of relevant evidence that a reasonable mind could accept as adequate to support a

conclusion.  *Hancock*, 667 F.3d at 472; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

 To determine whether substantial evidence exists, the Court must examine the record as a

whole, but it may not "undertake to re-weigh the conflicting evidence, make credibility

determinations, or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472

(quoting *Johnson*, 434 F.3d 653).  In considering the decision of the Commissioner based on the

record as a whole, the Court must "take into account whatever in the record fairly detracts from

its weight." *Breeden v. Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal*

*Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951)).  The Commissioner's findings as to any

fact, if substantial evidence in the record supports the findings, are conclusive and must be

affirmed regardless of whether the reviewing court disagrees with such findings.  *Hancock*, 667

F.3d at 477.  The substantial evidence standard presupposes "a zone of choice" allowing a

decision-maker to go either way, and the ALJ's decision "is not subject to reversal merely

because substantial evidence would have supported an opposite decision." *Dunn v. Colvin*, __ F.

App'x __, 2015 WL 3451568, at *2 (4th Cir. June 1, 2015) (unpublished) (quoting *Clarke v.*

*Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)).  If substantial evidence in the record does not

support the ALJ's determination or if the ALJ has made an error of law, the Court must reverse

the decision.  *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

 A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits.  20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d

171, 177 (4th Cir. 2000).  An ALJ conducts the analysis for the Commissioner, and it is that

13

process that a court must examine on appeal to determine whether the correct legal standards were applied, and whether substantial evidence in the record supports the resulting decision of the Commissioner. *Mastro*, 270 F.3d at 176-77. The ALJ uses a five-step process to evaluate a claimant's alleged disability. *Mascio v. Colvin*, 780 F.3d 632, 634 (4th Cir. 2015) (citing 20 C.F.R. § 416.920(a)(4)).

At step one, the ALJ determines whether the claimant has been working. *Id.* At step two, the ALJ determines whether the claimant's medical impairments meet the severity and duration requirements under the regulations. *Id.* At step three, the ALJ determines whether those medical impairments meet or equal an impairment listing under the regulations. *Id.* Before moving to step four, the ALJ also determines a claimant's residual functional capacity ("RFC"), which constitutes "the most" that a claimant could do despite the alleged physical and mental limitations. *Id.* at 635. At step four, the ALJ determines if the claimant can return to his or her past work given the ALJ's RFC determination. *Id.* at 634. At step five, the ALJ determines whether a claimant can perform other work existing in the economy. *Id.*

## V.    ANALYSIS

### A.  The ALJ's Decision

On August 23, 2013, the ALJ issued a written opinion denying Plaintiff's claim and concluding that Plaintiff was not disabled under the Act. (R. at 17-33.) The ALJ followed the five-step sequential evaluation process established by the Act. (R. at 21-22.)

At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since his alleged onset date. (R. at 22.) At step two, the ALJ determined that Plaintiff suffered the severe impairments of PTSD, Bipolar I Disorder, degenerative disc disease, asthma and obesity. (R. at 22.) At step three, the ALJ determined that Plaintiff did not have an

14

impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22-24.)

The ALJ further found that Plaintiff maintained the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c), but with certain limitations. (R. at 24.) Plaintiff could lift forty pounds occasionally and twenty pounds frequently. (R. at 24.) Plaintiff could sit, stand and walk between six to eight hours and needed to alternate between sitting and standing every forty-five minutes. (R. at 24.) Plaintiff could frequently climb ramps and stairs, but never climb ladders, ropes or scaffolds. (R. at 24.) He could occasionally stoop, kneel, crouch and crawl. (R. at 24.) Plaintiff needed to avoid extreme temperatures (hot and cold) and environmental irritants. (R. at 24.) Finally, Plaintiff was capable of performing unskilled work (SVP 2) in a non-production oriented work setting with no interaction with the public and no more than occasional interaction with co-workers and supervisors. (R. at 24.)

At step four, the ALJ found that Plaintiff could not perform any past relevant work. (R. at 27.) However, at step five of the analysis, considering Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy. (R. at 28.) Therefore, Plaintiff was not disabled under the Act. (R. at 28.)

Plaintiff challenges the ALJ's decision, arguing that the ALJ erred in assessing Plaintiff's credibility, in assessing Dr. Benesek's opinion and in assessing the VA's disability rating.[2] (Pl.'s

---

[2]     Plaintiff also mentions that the ALJ failed to consider lay witness testimony concerning Plaintiff's ability to work. (Pl.'s Mem. at 19.) Plaintiff's wife and mother both wrote letters to the ALJ, which allegedly corroborated Plaintiff's alleged symptoms. (R. at 256-57.) In support, Plaintiff cites a Ninth Circuit opinion. However, under Fourth Circuit precedence, "other source" opinions are entitled to significantly less weight and need not be expressly considered. *Craig*, 76 F.3d at 590 (finding that the ALJ did not err when failing to expressly consider the

Mem. at 8.) Defendant responds that the ALJ did not err and that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No.10) at 9-20.)

      B.  The ALJ did not err in assessing Plaintiff's credibility.

      Plaintiff argues that the ALJ erred in assessing Plaintiff's credibility, because the record demonstrated that Plaintiff suffered from PTSD, as well as Bipolar I Disorder, personality disorder and anxiety. (Pl.'s Mem. at 5.) Defendant maintains that substantial evidence in the record supports the ALJ's credibility determination. (Def.'s Mem. at 13-17.)

      After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on the claimant's credible complaints. In evaluating a claimant's subjective symptoms, the ALJ must follow a two-step analysis. *Craig*, 76 F.3d at 594; *see also* SSR 96-7; 20 C.F.R. §§ 404.1529(a), 416.929(a). The first step is to determine whether there is an underlying medically determinable physical or mental impairment or impairments that reasonably could produce the individual's pain or other related symptoms. SSR 96-7p at 1-3. In doing so, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p at 5, n.3; *see also* SSR 96-8p at 13 ("The RFC assessment must be based on all of the relevant medical evidence in the record . . . ."). If the underlying impairment reasonably could be expected to produce the individual's pain, then the second part of the analysis requires the ALJ to evaluate a claimant's statements about the intensity and persistence of the pain and the extent to which it affects the

---

opinion of a physical therapist, who merely qualified as an "other source" instead of an "acceptable medical source.").

individual's ability to work. *Craig*, 79 F.3d at 595. The ALJ's evaluation must take into account "all the available evidence," including a credibility determination of the claimant's statements regarding the extent of the symptoms, and the ALJ must provide specific reasons for the weight given to the individual's statements. *Craig*, 76 F.3d at 595-96; SSR 96-7p at 5-6, 11.

This Court must give great deference to the ALJ's credibility determinations. *Eldeco, Inc. v. N.L.R.B.*, 132 F.3d 1007, 1011 (4th Cir. 1997). The Fourth Circuit has determined that "[w]hen factual findings rest upon credibility determinations, they should be accepted by the reviewing court absent 'exceptional circumstances.'" *Id.* (quoting *N.L.R.B. v. Air Prods. & Chems., Inc.*, 717 F.2d 141, 145 (4th Cir. 1983)). Therefore, this Court must accept the ALJ's factual findings and credibility determinations unless "'a credibility determination is unreasonable, contradicts other findings of fact, or is based on an inadequate reason or no reason at all.'" *Id.* (quoting *N.L.R.B. v. McCullough Envtl. Servs., Inc.*, 5 F.3d 923, 928 (5th Cir. 1993)).

Furthermore, Plaintiff's subjective allegations of pain do not alone provide conclusive evidence that Plaintiff is disabled. *Mickles v. Shalala*, 29 F.3d 918, 919 (4th Cir. 1994). Instead, "subjective claims of pain must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Craig*, 76 F.3d at 591.

The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements regarding the intensity, persistence and limiting effects were not credible for the reasons detailed in the opinion. (R. at 25.) The ALJ later stated that Plaintiff's allegations were not supported by the record and were inconsistent with Plaintiff's own statements. (R. at 25.)

Substantial evidence supports the ALJ's decision on the basis of medical records. Plaintiff's progress notes dated between December 2011 and April 2013 consistently included mental health status examinations that found that Plaintiff was casually dressed, cooperative and maintained good eye contact. (R. at 293-94, 298.) Additionally, the reports consistently indicated that Plaintiff had a linear, logical, goal-oriented thought process, as well as non-pressured, relevant and fluent speech. (R. at 293-94, 298.) During the mental health status examinations, Plaintiff had no suicidal or homicidal ideation and no delusions or obsessions. (R. at 293-94, 298.) Plaintiff's affect was consistently noted to be appropriate and full range, and his insight and judgment were fair. (R. at 293-94, 298.) Subsequent mental health status examinations conducted through April 19, 2013, revealed similar findings. (R. at 303, 328, 347, 423, 457, 472, 476, 479.)

The ALJ also considered Plaintiff's treatment history and response to medication and PTSD counseling. In January 2011 and thereafter, Plaintiff reported that he found the PTSD treatment programs helpful. (R. at 293, 421, 456.) The ALJ reviewed Plaintiff's progress notes and concluded that he was generally doing well, without severe psychiatric symptoms and that medication helped control Plaintiff's symptoms. (R. at 26.)

Plaintiff's own statements also support the ALJ's decision. Plaintiff testified that he watched his sons at martial arts classes and exercised by lifting weights two to three times a week. (R. at 40-41, 57.) Plaintiff testified that the heaviest weight that he could consistently lift was 185 pounds. (R. at 48.) Plaintiff testified that he drove twice a week, cut his one-acre lot with a tractor once a week, washed the dishes approximately twice a month and went to the grocery store and visited with friends monthly. (R. at 53-59.) Additionally, Plaintiff testified that he took his children to an amusement park upon the recommendation of those involved with

18

the PTSD program at the VAMC. (R. at 58.) Therefore, substantial evidence supports the ALJ's credibility determination.

    C. The ALJ did not err in assessing Dr. Benesek's opinion.

    Plaintiff argues that the ALJ erred in assessing Dr. Benesek's opinion. (Pl.'s Mem. at 24-28.) Defendant maintains that substantial evidence in the record supports the ALJ's decision. (Def.'s Mem. at 17-20.)

    During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments that would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence resulting from consultative examinations or medical expert evaluations that have been ordered. 20 C.F.R. §§ 404.1512(a)-(e), 404.1527, 416.912(a)(e), 416.927. When the record contains a number of different medical opinions, including those from Plaintiff's treating sources, consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. §§ 404.1520b(a), 416.920b(a). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(c)(2)-(6), (e), 416.927(c)(2)-(6), (c).

    Under the regulations, only an "acceptable medical source" may be considered a treating source that offers an opinion entitled to controlling weight. SSR 06-03p. Acceptable medical sources include licensed physicians, licensed or certified psychologists and certain other specialists, depending on the claimed disability. 20 C.F.R. §§ 404.1527(a), 416.913(a). The regulations also provide for the consideration of opinions from "other sources," including nurse-

19

practitioners, physician's assistants or therapists. 20 C.F.R. §§ 404.1513(d), 416.913(d).[3]  Under the applicable regulations and case law, a treating source's opinion must be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the record. *Craig*, 76 F.3d at 590; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); SSR 96-2p.  Further, the regulations do not require that the ALJ accept opinions from a treating source in every situation, *e.g.*, when the source opines on the issue of whether the claimant is disabled for the purposes of employment (an issue reserved for the Commissioner), or when the treating source's opinion is inconsistent with other evidence or when it is not otherwise well-supported. 20 C.F.R. §§ 404.1527(c)(3)-(4), (d), 416.927(c)(3)-(4), (d).

The ALJ must consider the following when evaluating a treating source's opinion:  (1) the length of the treating source relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability based upon the medical record; (4) consistency between the opinion and the medical record.; (5) any specialization on the part of the treating source; and (6) any other relevant factors. 20 C.F.R. §§ 404.1527(c), 416.927(c). However, those same regulations specifically vest the ALJ — not the treating source — with the authority to determine whether a claimant is disabled as that term is defined under the Act. 20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1).  Although the regulations explicitly apply these enumerated factors only to treating sources, those same factors may be applied in evaluating opinion evidence from "other sources." SSR 06-03p.

---

[3]     The regulations detail that "other sources" include medical sources that are not considered "acceptable medical sources" under 20 C.F.R. §§ 404.1513(a) and 416.913(a).  The given examples are a non-exhaustive list.

In this case, Dr. Benesek opined that Plaintiff's PTSD had not remitted and was chronic and highly resistant to change despite regular group and individual treatment. (R. at 454.) Dr. Benesek wrote that Plaintiff's overall clinical presentation was marked by significant interpersonal, occupational and social impairment. (R. at 454.) Dr. Benesek opined that Plaintiff's condition was unlikely to significantly improve in the future and that disregarding all other medical conditions that Plaintiff had, Plaintiff was unable to obtain or maintain gainful employment due to his PTSD. (R. at 454.)

The ALJ gave no treating source controlling weight and was forced to reconcile several medical opinions. The ALJ did not completely reject Dr. Benesek's opinion; rather, the ALJ assigned Dr. Benesek's opinion little weight, because his opinions were not entirely supported by the record, failed to assess the degree of Plaintiff's specific mental functional limitations and were inconsistent with Plaintiff's stated activities. (R. at 27.)

Substantial evidence supports the ALJ's decision on the basis of Plaintiff's medical records. Plaintiff's progress notes dated between December 2011 and April 2013 included mental health status examinations that consistently found that Plaintiff was casually dressed, cooperative and maintained good eye contact. (R. at 293-94, 298.) Additionally, the reports consistently stated that Plaintiff had a linear, logical, goal-oriented thought process as well as non-pressured, relevant and fluent speech. (R. at 293-94, 298.) During the mental health status examinations, Plaintiff reportedly had no suicidal or homicidal ideation and no delusions or obsessions. (R. at 293-94, 298.) Plaintiff's affect was consistently noted to be appropriate and full range, and his insight and judgment were fair. (R. at 293-94, 298.) Subsequent mental health status examinations conducted through April 19, 2013, revealed similar findings. (R. at 303, 328, 347, 423, 457, 472, 476, 479.)

21

Finally, substantial evidence in the record supports the ALJ's decision on the basis of Plaintiff's testimony and function report. Plaintiff testified that he watched his sons at martial arts classes and exercised by lifting weights two to three times a week. (R. at 40-41, 57.) Plaintiff testified that the heaviest weight that he could consistently lift was 185 pounds. (R. at 48.) Plaintiff testified that he drove twice a week, cut his one-acre lot with a tractor once a week, washed the dishes approximately twice a month and went to the grocery store and visited with friends monthly. (R. at 53-59.) Additionally, Plaintiff took his children to an amusement park, upon the recommendation of those involved with the PTSD program at the VAMC. (R. at 58.) Therefore, substantial evidence supports the ALJ's decision.

      D. Dr. Benesek's November 20, 2013 letter does not constitute new evidence requiring remand.

In support of his argument that the ALJ erred in assessing Dr. Benesek's opinion, Plaintiff cites to a November 20, 2013 letter from Dr. Benesek. (Pl.'s Mem. at 27.) The letter included an update of Plaintiff's conditions, as well as additional observations and reactions. (Pl.'s Mem. at 27.) Dr. Benesek's letter was not before the ALJ, but was available to the Appeals Council. Defendant argues that the ALJ provided legally sufficient reasons for the weight afforded to Dr. Benesek's February 2012 opinion and that she supported those reasons in the body of her decision. (Def.'s Mem. at 20.) Although Plaintiff does not specifically argue that the Appeals Council should have reversed in light of Dr. Benesek's November 20, 2013 letter, Plaintiff uses the letter in support of his argument that the ALJ erred in assessing Dr. Benesek's opinion. Therefore, the Court will discuss whether this new evidence warrants remand.

In determining whether the ALJ's decision was supported by substantial evidence, a district court may not consider evidence that was not presented to the ALJ. *Smith v. Chater*, 99

F.3d 635, 638 n.5 (4th Cir. 1996) (citing *United States v. Carlo Bianchi & Co.*, 373 U.S. 709, 714-15 (1963)); *Huckabee v. Richardson*, 468 F.2d 1380, 1381 (4th Cir. 1972) (citing *Vitek v. Finch*, 438 F.2d 1157 (4th Cir. 1970)) (noting that reviewing courts are restricted to the administrative record in determining whether the decision is supported by substantial evidence). Although the Court may not consider evidence that was not considered by the ALJ, the Act provides that the Court may remand a case for reconsideration in two situations.  42 U.S.C. § 405(g).  The first is a "sentence four" remand, which provides that the "court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner with or without remanding the cause for a rehearing." *Id.*  The second is a "sentence six" remand, which provides that the court "may at any time order additional evidence to be taken before the Commissioner, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

A reviewing court may remand a case on the basis of newly discovered evidence if four prerequisites are met:  (1) the evidence must be relevant to the determination of disability at the time that the application was first filed and not be merely cumulative; (2) the evidence must be material; (3) there must be good cause for the failure to submit the evidence before the Commissioner; and (4) the claimant must present to the remanding court a general showing of the nature of the new evidence. *Border v. Heckler*, 777 F.2d 954, 955 (4th Cir. 1985).  Because Plaintiff has offered new evidence to the Court, the Court will address whether Plaintiff has fulfilled the requirements to justify a sentence six remand.

In this case, Plaintiff satisfies the third and fourth requirements of *Borders*.  Good cause for Plaintiff's failure to submit earlier exists, because the November 20, 2013 letter was

23

completed after the ALJ issued her August 23, 2013 written decision. Plaintiff has also made a general showing of the nature of the new evidence, because he entered the letter into the record and briefly discussed the letter in his motion.

Plaintiff fails, however, to show that the new evidence is material and not merely cumulative. Evidence must be material to the extent that the Commissioner's decision "might reasonably have been different" had the new evidence been before the ALJ. *Borders*, 777 F.2d at 955-56 (citation and internal quotation marks omitted). Had the ALJ considered Dr. Benesek's November 20, 2013 letter, the Commissioner's decision would not have reasonably been different.

Dr. Benesek's November 20, 2013 letter gives an update of Plaintiff's conditions, as well as additional observations and reactions following the ALJ's written decision. However, the letter offers little more than a restatement of Dr. Benesek's opinions of Plaintiff's condition, which were included in a previous letter dated February 7, 2012. (R. at 453-54, 512-15.) Dr. Benesek's February 7, 2012 letter was submitted to the Commissioner before the ALJ held a hearing on July 31, 2013. As noted above, the ALJ properly considered and weighed Dr. Benesek's opinion. Further, Dr. Benesek's opined that Plaintiff was unable to obtain or maintain gainful employment due to his interpersonal, occupational and social impairment; however, the determination of whether Plaintiff is disabled for the purposes of employment is one reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(3)-(4), (e). Accordingly, because Dr. Benesek's November 20, 2013 letter offers little more than a restatement of his February 7, 2012 opinions and observations, Plaintiff fails to satisfy the first two *Borders* requirements. Therefore, the newly offered evidence fails to meet the requirements for remand.

E.  The ALJ erred in assessing the VA disability determination.

Plaintiff argues that the ALJ erred in assessing the VA disability determination. (Pl.'s Mem. at 8.) Defendant maintains that the ALJ afforded appropriate consideration to the Plaintiff's VA disability rating. (Def.'s Mem. at 9-13).

In *Bird v. Commissioner of Social Security*, 699 F.3d 337 (4th Cir. 2012), the Fourth Circuit directly addressed the weight to be assigned to the determinations of the VA. The Fourth Circuit acknowledged that the Social Security Administration ("SSA") and the VA apply different standards in determining disability, but noted that both agencies "serve the same governmental purpose of providing benefits to persons unable to work because of a serious disability" and that both require extensive medical documentation. *Bird*, 699 F.3d at 343. As a result, a disability rating by one of the two agencies is "highly relevant to the disability determination of the other." *Id.* Accordingly, the Fourth Circuit held that an ALJ must presumptively afford a VA determination substantial weight. *Id.*

The Fourth Circuit, however, did recognize that the "SSA employs its own standards for evaluating a claimant's alleged disability, and the effective date of coverage . . . under the two programs will likely vary." *Id.* Therefore, the Commissioner may afford a VA determination less than substantial weight if "the record before the ALJ *clearly demonstrates* that such a deviation is appropriate." *Id.* (emphasis added). To meet this standard, the ALJ must discuss, in detail, why or how the VA rating decisions were entitled to only limited weight. *Sheldon v. Colvin*, 2014 WL 1364984, at *3 (D.S.C. Apr. 7, 2014). An ALJ must not dismiss the import of such decisions in a conclusory fashion. *Id.* "In the absence of an explanation of why the VA rating is afforded less weight, remand is the appropriate remedy." *Id.; see also Persaud v. Colvin*, 2014 WL 198922, at *10 (E.D.Va. Jan. 14, 2014) (stating that "[t]he Fourth Circuit has now made it clear that the ALJ must give the VA's disability rating 'substantial weight' or

25

explicitly detail the reasons for giving it less weight"); *Thomas v. Colvin*, 2013 WL 5962929, at *9 (E.D.Va. Nov. 6, 2013) ("[R]emand is necessary in order to allow the ALJ to weigh the evidence of [Plaintiff's] VA rating in accordance with *Bird*."); *Jacobs v. Colvin*, 2013 WL 5741538, at *12 (E.D.Va. Oct. 22, 2013) (remanding where evidence was only a "two-page letter, along with a one page attachment, from the VA outlining [Plaintiff's] benefits and related disabilities," because it was unclear if ALJ met the *Bird* requirement).

Here, the ALJ noted that she had considered the VA's disability determination. (R. at 27.) She noted that Plaintiff's psychiatric disorder had increased to seventy percent disabling. (R. at 27.) The ALJ then afforded the VA determination "little weight as the adjudication of disability by the [VA] utilizes different regulatory standards than that of the [SSA]." (R. at 27.) The ALJ did not discuss in any detail why or how the VA disability ratings should be afforded less than substantial weight. (R. at 27.) Instead, she dismissed the import of these decisions in a conclusory fashion on the sole basis that the VA and the SSA utilize different regulatory standards in determining Plaintiff's disability. (R. at 27.) The Fourth Circuit has made it clear that the ALJ must give the VA's disability determination "substantial weight" or explicitly detail the reasons for giving it less weight. *Id.* Therefore, remand is necessary to allow the ALJ to weigh the evidence of Plaintiff's VA rating in accordance with the Fourth Circuit's decision in *Bird*.

## VI. CONCLUSION

For the reasons set forth above, the Court recommends that Defendant's Motion for Summary Judgment (ECF No. 10) be DENIED, that Plaintiff's Motion for Summary Judgment (ECF No. 8) be GRANTED and that the final decision of the Commissioner be VACATED and REMANDED for further analysis consistent with this Report and Recommendation.

## NOTICE TO PARTIES

Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a _de novo_ review of the determinations contained in this report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.

                                             /s/
                                   David J. Novak
                                   United States Magistrate Judge

Richmond, Virginia
Date: August 27, 2015